# JOHN McKENZIE v. STATE.

No. A-5318.   Opinion Filed April 8, 1926.
Rehearing Denied May 15, 1926.
(245 Pac. 1005.)

Warren & Welch and Welch & Welch, for plaintiff in error.

Geo. F. Short, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

EDWARDS, J.   The plaintiff in error, hereinafter called defendant, upon a charge of murder, was convicted in the district court of Pushmataha county for manslaughter in the first degree, and sentenced to the state penitentiary for a term of 15 years.

The record discloses a state of facts about as follows: Jack Grogan, a son-in-law, was shot and killed by defendant November 18, 1923. There had been some ill feeling between them growing out of business matters and of alleged mistreatment of the daughter of defendant by deceased. Threats had been made by deceased against defendant, which had been communicated. At the time of the homicide, the daughter with an infant child was living with a family named Bailey some 9 miles from the residence of defendant. The deceased on that day came from the neighborhood of Ft. Towson to the place where his wife and infant child were living, and in doing so passed along the road near the house of defendant. It was not shown that defendant knew this, but the same afternoon defendant went from his home to the place where his daughter lived, carried a Winchester in his hand, and had with him whisky and was drinking. With him was the witness Henry, whom he had hired to pilot him there. He rode up near the house where his daughter lived. A man named Hood and deceased were seated on the porch; the deceased playing with his infant child, with his back toward defendant. Deceased did not see defendant until he had alighted from his horse. He then started to run, and had taken about two steps when defendant with his rifle fired one shot from the hip, killing him instantly. The witness Hood testified that when deceased ran defendant shouted to him, "Come back here," before he fired, and after the shot was fired said "he had come to kill the son of a bitch, and had done what he came to do." The evidence also was that, as deceased was shot, he was in a stooped, running position, which is corroborated by evidence that the bullet that passed through his head entered the wall 34 inches above the floor.

Defendant testified that there was a gun over the door, or on the wall about the height of the door, and that deceased was reaching for it when he fired, and that

he aimed the gun from the "neck up," and that after shooting he reloaded and refused to deliver the gun to his daughter, who came out and begged him not to shoot any more. There was also evidence that on the road from his home to the scene of the homicide he inquired of the witness Holley if he had seen deceased pass the road, and also that he asked Holley not to tell that he had made the inquiry. Defendant testified that he did not remember that conversation, and denied that he made the statement attributed to him after shooting deceased. He further testified that he entertained ill feeling toward the deceased, explained his presence at the place by stating he was carrying some school examination papers to his daughter, who was a teacher, admitted having whisky with him at the time and drinking, and explained having his gun by saying he intended to shoot fish. There are some other incidental matters connected with the homicide that are not material to be stated.

Only two assignments of error are argued in the briefs: First, that the court erred in overruling the motion for a new trial on the ground of newly discovered evidence; second, that the court erred in admitting in evidence a diagram of the scene of the homicide. These assignments will be considered in order.

Considering the first assignment: This matter of newly discovered evidence is presented in a supplemental motion for a new trial, and defendant relies upon the affidavit of Sarah Grogan, daughter of defendant and wife of deceased, in which she states that defendant did not say to her, or in her presence immediately after the homicide that: "I came up here to kill the damn son of a bitch, and I did what I came to do." This is contradictory of the testimony of the witness Hood. Sarah Grogan was present at the trial, and was not called as a witness either by the state or by defendant. Whether or not she was questioned by counsel for defendant on this

point is not clear from the motion. It contains the mere conclusion that "defendant herein and his counsel made every effort to secure this information from the witness in time to have used same at the trial, and the witness Sarah Grogan withheld this information from them." The motion further sets out the affidavit of Cora Barnett, who states that she approached the place of the homicide a short distance behind defendant and the witness Henry, and that she saw defendant ride up to the paling fence in front of the house, drop his reins, and get off his horse, and saw the deceased, Grogan, and Hood on the porch; that as the defendant dismounted from his horse the deceased arose and went diagonally across the porch immediately toward the place where there was a gun hanging, and just as he arose and started she heard the defendant say, "Stop, don't get that gun," and at this time defendant was standing at the paling fence in front of the house; that his gun was pointing in the direction of deceased with the muzzle of the gun projecting over the paling fence when he fired; that she went away without telling any one until after the trial. This is cumulative to the testimony of defendant and of the witness Henry, who was with him, and in conflict with the testimony of the witness Hood. The conclusion to be reached from the motion and affidavit is that no one knew that this witness saw the homicide, although it does not appear that her presence might not have been known to some of the witnesses.

Also there is attached to the motion the affidavit of Virgil Bailey, a boy 9 years old, who was a witness of the homicide, and who stood near the edge of the porch when the fatal shot was fired. The presence of this boy and another small boy is disclosed by the testimony of the first witness who testified for the state, and, although known to the defendant, he was not called, and it does not appear that either of these bows was questioned as

to the appearance of the affiant Cora Barnett at the scene.

There is also attached the affidavit of R. H. Miller and P. E. Cogburn, in substance, that, after the preliminary trial, the witness Hood said in their presence that, if defendant was not convicted, he would have to leave the country, as he had sworn falsely to please another party.

The rule adopted by this court as to newly discovered evidence may be stated thus: A new trial should be granted upon the ground of newly discovered evidence only where it is apparent that all reasonable diligence of which the subject is susceptible has been exercised by the defendant to procure the evidence at the trial, if it is also apparent that the newly discovered evidence might reasonably affect and probably would change the result of the trial. It is addressed to the discretion of the trial court, and its ruling will not be disturbed except for an abuse of discretion. It is not enough that the evidence tends to discredit or impeach the witnesses for the state, or is cumulative. McHugh v. Territory, 17 Okla. 1, 86 P. 433; Slater v. U. S., 1 Okla. Cr. 275, 98 P. 110; Caple v. State, 3 Okla. Cr. 621, 105 P. 681; Johnson v. State, 5 Okla Cr. 1, 112 P. 760; Drew v. State, 6 Okla. Cr. 348, 118 P. 677; Noel v. State, 14 Okla. Cr. 548, 174 P. 293; Hill v. State, 17 Okla. Cr. 356, 188 P. 695; Howey v. State, 9 Okla. Cr. 453, 132 P. 499.

Due diligence to procure testimony in the first instance must be shown. It is not sufficient merely to allege the use of due diligence, but the facts constituting diligence must be set out. The witnesses known to be present should be interrogated to ascertain fully the surrounding facts and circumstances, and the presence of other witnesses who might be in possession of material testimony. Such does not appear. Upon an examination of the entire record, this court cannot say that the trial court

abused its discretion in overruling the motion for a new trial. Seigler v. State, 11 Okla. Cr. 131, 145 P. 308.

Upon the second assignment it appears that the plat or diagram in question was drawn by the county surveyor and represented the scene of the homicide, and in addition indicated places designated by the witness Hood as to the position of defendant when the shot was fired, the location of deceased, the place where the bullet entered the house, and other objects. The following appears in the record:

"Q. (Mr. Box, for the State) : I hand you State's Exhibit No. 1, and ask you, Mr. Hood, to state what that is? A. Looks like a picture of the house.

"Q. Mr. Hood, I will ask you to state to the court and jury whether or not you were present at the time the measurements on the map were taken and whether or not you saw them made? A. Yes, sir. * * *

"Mr. Box: We desire to offer it in evidence.

"Mr. Welch (Counsel for Defendant) : No objection."

After the introduction of this exhibit in evidence it was frequently referred to by both the state and the defendant, and it was near the close of the trial before objections were made and motion to strike interposed. The ruling of the court on this point was not erroneous. Rawlins v. State, 24 So. 65, 40 Fla. 155; State v. Shaw, 50 A. 863, 73 Vt. 149.

We are led to the irresistible conclusion that the killing was not in self-defense, but on account of ill feeling from defendant toward deceased on account of business relations and on account of ill treatment or fancied ill treatment of deceased toward his wife, the daughter of defendant. The evidence makes a case of murder, and the jury was lenient in returning a verdict of manslaughter and in assessing the punishment at 15 years.

The case is affirmed.

BESSEY, P. J., and DOYLE, J., concur.